UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**UNITED STATES OF AMERICA**

v.                                                                                    Case No: 6:17-cr-8-Orl-41KRS

**RICHARD LUECK**
_____/

**ORDER**

THIS CAUSE is before the Court on Defendant's Motion to Dismiss for Outrageous Government Conduct (Doc. 31) and Defendant's Motion to Suppress Evidence (Doc. 32). The United States filed a Response in opposition to each of Defendant's Motions. (Doc. Nos. 40, 43). On March 15, 2017, a hearing was held to allow the parties to supplement their motions with oral argument. (Min. Entry, Doc. 46). For the reasons stated herein, both Motions will be denied.

**I.     BACKGROUND**

Defendant was charged by indictment with two counts of receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2) occurring around August 28, 2015, and around September 13, 2015, respectively, and one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5) occurring around September 15, 2015. (Indictment, Doc. 1, at 1–2). Defendant was first identified through an FBI investigation into a child pornography website known as "Playpen."[1] (Sept. 10, 2015 Appl. for a Search Warrant, Doc. 31-1, ¶ 5). Playpen allowed users to access and share child pornography. (Feb. 20, 2015 Appl. for Search Warrant, Doc. 31-4, ¶ 6).[2] It

---

[1] The Government refers to Playpen as "Website A" or the "Target Website" in many of the cited filings. (*See* Doc. 31-1 at 11 n.1; Doc. 31 at 3).

[2] Docket Entry 31-4 has multiple sections with numbered paragraphs. For ease of reference, all citations to paragraphs within Docket Entry 31-4 refer to the numbered paragraphs in the Affidavit in Support of Application for Search Warrant, on pages 5–35 of the document.

seems that Playpen began operating in August 2014. (*Id.* ¶ 11). Between August 2014 and February 2015, the website accumulated an excess of 150,000 members, 95,000 posts, and 9,000 topics related to child pornography. (*Id.*). Playpen operated on The Onion Router ("Tor"), an anonymous internet network, which allowed users to access the website while remaining anonymous—that is, without revealing their internet protocol ("IP") address, geographic location, or other identifying information. (*Id.* ¶¶ 7–8). Accordingly, when a user accessed Playpen through Tor, there was no practical way to trace the user's IP address. (*Id.* ¶ 8). Nor was there any practical way to find the IP address of a website that operated as a "hidden service" on Tor, such as Playpen. (*Id.* ¶ 9).

Through its investigation, the Government discovered that Playpen was being hosted on a server in Lenoir, North Carolina. (*See id.* ¶ 28). In January 2015, the Government acquired and executed a search warrant in the Western District of North Carolina and seized the server that hosted the Playpen website. (*Id.*). On February 20, 2015, the FBI seized and assumed administrative control of Playpen. (Doc. 31-1 ¶ 10). The Government operated the Playpen website from a government-controlled server in Newington, Virginia, located in the Eastern District of Virginia, until March 4, 2015, when the Government ultimately shut down Playpen. (*Id.*). Also on February 20, 2015, the Government obtained a warrant ("NIT Warrant") from United States Magistrate Judge Theresa Buchanan of the Eastern District of Virginia to deploy a Network Investigative Technique ("the NIT").[3] (*Id.* ¶ 23; Search & Seizure Warrant, Doc. 31-3, at 2).[4]

---

[3] The NIT is comprised of a set of computer instructions designed to transmit computer-related identifying information, including the IP address from the computers of registered Playpen users to a government-controlled computer, allowing the Government to identify and locate individuals who had accessed Playpen to view and share child pornography. (Doc. 31-4 ¶¶ 33–35).

[4] On February 20, 2015, the Government also obtained an order from a Federal District Judge of the Eastern District of Virginia, permitting the Government to intercept communications between Playpen users. (*See generally* Doc. 32-5).

In applying for the NIT Warrant, FBI Special Agent Macfarlane submitted an affidavit in support of the NIT Warrant. (*See* Doc. 31-4 at 5). The affidavit sought a search warrant which permitted the Government to use the NIT to "cause an activating computer–wherever located–to send to a computer controlled by or known to the government, network level messages containing information that may assist in identifying the computer, its location, [and] other information about the computer and the user of the computer." (*Id.* ¶ 46(a)). The affidavit included details about how the NIT operated and the information it would gather from an "activating computer." (*See id.* ¶¶ 33–34). An "activating computer" was defined as the computer of any user who logged into Playpen by entering his or her username and password. (*Id.* at 36). The NIT would operate as follows. The computer code comprising the NIT would become part of Playpen's digital content and would reside on the government-controlled server in Newington, Virginia. (*Id.* ¶ 33). Once a user entered his or her username and password to log into Playpen, the website would send content to the user's computer, including the NIT instructions, which the user's computer would download. (*Id.*). After the NIT instructions were downloaded on a user's computer, the user's computer would send specific location-identifying information back to the Government. (*Id.* ¶¶ 33–34).

The NIT Warrant described the place to be searched by referring to "Attachment A," (Doc. 31-3 at 1), which stated that the FBI was permitted to operate the NIT on the government-controlled server in the Eastern District of Virginia, which was running the Playpen website, (*id.* at 2). The NIT Warrant further authorized the Government to deploy the NIT to obtain certain information, which was listed in "Attachment B," from "activating computers," defined as the computers "of any user or administrator who logs into [Playpen] by entering a username and password." (*Id.*). The NIT Warrant described the property to be seized by referencing "Attachment

B," (*id.* at 1), which contained a list of seven pieces of information to be received from the activating computers, including the computers' IP addresses, (*id.* at 3).

From February 20, 2015, through March 4, 2015, the Government maintained administrative control of Playpen while deploying the NIT to identify Playpen users. (*See* Doc. 31-1 ¶ 23). On February 24, 2015, the FBI identified an IP address related to the Playpen user "Fred Flintstone"—which the Government would later discover belonged to Defendant—after he had accessed content on the website.[5] (*See id.* ¶¶ 24–26). The Government also determined that "Fred Flintstone" accessed content on Playpen on February 25, 2015, and March 3, 2015. (*Id.* ¶ 27). Although the NIT Warrant permitted the Government to deploy the NIT for thirty days, (Doc. 31-4 at 1), the FBI ceased using the NIT and shut down Playpen after thirteen days. (*See* Doc. 31-1 ¶ 10).

Thereafter, the FBI linked the IP address of user "Fred Flintstone" to his home address, located in the Middle District of Florida. (*See id.* ¶ 30). The FBI obtained a Residential Warrant from Magistrate Judge David A. Baker in the Middle District of Florida to search Defendant's home and computers. (Search & Seizure Warrant, Doc. 31-2). On September 15, 2015, agents searched Defendant's residence, seizing Defendant's computer, hard drives, and other electronic devices, which contained pictures of child pornography as well as additional evidence indicating that Defendant possessed and received child pornography in August and September of 2015. (Doc. 32 at 3–4; Doc. 43 at 7).

---

[5] "Fred Flintstone" became a registered user of Playpen on February 18, 2015, (Doc. 31-1 ¶ 25), before the Government took control of the website.

Defendant was subsequently indicted. (*See generally* Doc. 1). He now moves to dismiss the indictment based on the outrageous government conduct defense. Defendant also moves to suppress the evidence that the Government obtained in executing the residential search warrant.

## II.    MOTION TO DISMISS BASED ON OUTRAGEOUS GOVERNMENT CONDUCT

### A.    Legal Standard

Although the United States Supreme Court has not articulated what precisely constitutes outrageous government conduct, it has recognized that there may be a situation "in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–32 (1973). According to the Eleventh Circuit, "[o]utrageous government conduct occurs when law enforcement obtains a conviction for conduct beyond the defendant's predisposition by employing methods that fail to comport with due process guarantees." *United States v. Ciszkowski*, 492 F.3d 1264, 1270 (11th Cir. 2007). "Under this standard, the conduct must be so outrageous that it is fundamentally unfair." *Id.*; *see also United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (explaining that dismissal based on outrageous government conduct is only appropriate in "extreme cases in which the defendant can demonstrate that the government's conduct violates fundamental fairness and is so grossly shocking and so outrageous as to violate the universal sense of justice" (quotation omitted)); *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011) (articulating the same standard). "Because of the courts' 'well-established deference to the Government's choice of investigatory methods[,'] this is a 'very heavy' burden." *United States v. Kim*, No. 16-CR-191 (PKC), 2017 WL 394498, at *2 (E.D.N.Y. Jan. 27, 2017) (quoting *Al Kassar*, 660 F.3d at 121).

Notably, the outrageous government conduct defense has never been applied in this Circuit. *United States v. Jayyousi*, 657 F.3d 1085, 1111 (11th Cir. 2011); *see also Ciszkowski*, 492 F.3d at 1272 (Carnes, J., concurring) (stating that the outrageous government conduct defense was rooted in "speculative dicta" and that the Eleventh Circuit has never "reversed a conviction or vacated a sentence" based on the defense). The Eleventh Circuit has made clear, however, that in order for the outrageous government conduct defense to apply, the "actionable government misconduct must relate to the defendant's underlying or charged criminal acts." *Jayyousi*, 657 F.3d at 1111.

**B.    Analysis**

Defendant seeks dismissal based on the United States' allegedly outrageous conduct, arguing that the Government's conduct violated his due process rights under the Fourth and Fifth Amendments to the United States Constitution as well as Federal Rule of Criminal Procedure 12(a)(3). Defendant argues that the Government acted outrageously when it maintained control over Playpen for a twelve-day period. Defendant contends this conduct was outrageous because by assuming administrative control over Playpen, the Government allowed vast amounts of child pornography to be disseminated without any restrictions or limitations, despite the Government's ability to place controls on the website. Defendant also argues that allowing such widespread distribution of child pornography caused the victims to be repeatedly harmed and also asserts that the Government failed to take any steps to reduce the resulting harm to the victims. Additionally, Defendant emphasizes that the number of Playpen users drastically increased while the website was under the Government's control. The United States contends that it merely assumed administrative control to monitor the website so that it could obtain information to identify Playpen users, that it did not make any additional content available to Playpen users, and that it sought court authorization from two different judges before it seized Playpen for the twelve-day period.

Thus, the United States argues that the outrageous government conduct standard has not been met here.

Defendant does not claim that the Government caused him to commit the crimes he has been charged with nor do his claims demonstrate more broadly that the Government's alleged misconduct is related to his criminal acts. *See id.* at 1112. These shortcomings are not surprising given the unlikelihood that Defendant could plausibly assert as much. The Government did not create Playpen, post any child pornography or any links to child pornography on the website, and did not induce Defendant to possess and download child pornography. The Government only monitored the Playpen website to obtain identifying information about Defendant and thus had no involvement in Defendant's criminal conduct. In fact, the Government shut down the Playpen website before Defendant engaged in the criminal conduct with which he has been charged. Accordingly, based on the law of this Circuit, the outrageous governmental conduct defense does not apply here. *See id.* (holding that the outrageous government conduct defense did not apply where the appellant did not claim that the government caused him to engage in the behaviors which led to his conviction and where the government's conduct occurred at a different point in time than when the appellant committed the criminal acts for which he was charged).

Finally, all courts that have considered this precise due process challenge based on the Government's operation of the Playpen website, including one Middle District of Florida court, have declined to dismiss the indictment based on the outrageous government conduct defense. *See generally United States v. Kneitel*, No. 8:16-cr-23-T-35JSS (M.D. Fla. Jan. 3, 2017), Doc. 158; *Kim*, 2017 WL 394498; *United States v. Vortman*, No. 16-cr-00210-TEH-1, 2016 WL 7324987 (N.D. Cal. Dec. 16, 2016); *United States v. Hammond*, No. 16-cr-00102-JD-1, 2016 WL 7157762 (N.D. Cal. Dec. 8, 2016); *United States v. Owens*, No. 16-CR-38-JPS, 2016 WL 7079617 (E.D.

Wis. Dec. 5, 2016); *United States v. Tippens*, No. 3:16-cr-05110-RJB (W.D. Wash. Nov. 30, 2016), Doc. 106; *United States v. Anzalone*, No. 15-10347-PBS, 2016 WL 6476939 (D. Mass. Oct. 28, 2016); *United States v. Allain*, No. 15-cr-10251, 2016 WL 5660452 (D. Mass. Sept. 29, 2016); *United States v. Chase*, No. 15-CR-00015-RLV-DCK-1 (W.D.N.C. Sept. 6, 2016), Doc. 85.[6] Defendant's arguments as to why this case should be dismissed based on outrageous government conduct are similar to those made in the aforementioned cases; in many instances, the arguments are identical. Therefore, based on the reasons stated above and the persuasive reasoning of the courts that have already addressed this issue, this Court concludes that that the United States' conduct was not outrageous and that dismissal of the indictment is not warranted.

### III.  MOTION TO SUPPRESS

#### A.  Legal Standard

The Fourth Amendment to the United States Constitution provides that every person has the right "to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The Supreme Court has generally interpreted this to mean that a search must be based on probable cause and must be executed pursuant to a warrant." *United States v. Adams*, No. 6:16-cr-11-ORL-40GJK, 2016 WL 4212079, at *3 (M.D. Fla. Aug. 10, 2016) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). Further, "[t]he Fourth Amendment provides that 'a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity.'" *Id.* (quoting *Kentucky v. King*, 563 U.S. 452, 459 (2011)). "Evidence obtained in violation of the Fourth Amendment may be

---

[6] Eight of the nine courts held that the United States' conduct was not outrageous. While one court concluded that the United States' conduct was outrageous, it ultimately declined to dismiss the case. *See Tippens*, 3:16-cr-05110-RJB, Doc. 106 at 8–10.

suppressed pursuant to the exclusionary rule only when suppression is warranted to deter violations of the Fourth Amendment." *Id.* (citing *Davis v. United States*, 564 U.S. 229, 238 (2011)).

**B.     Analysis**

Defendant argues that the unlawful use of the NIT to obtain identifying information about him resulted in the illegal search of his computer. Accordingly, Defendant requests that the Court suppress all evidence obtained from the Government's allegedly illegal search, including evidence obtained from Defendant's computer and phone, digital images seized from him, and all statements obtained from Defendant based on information gathered through the purportedly unlawful search. Defendant argues that the NIT Warrant violated the Fourth Amendment because it was not sufficiently particular. Defendant also argues that the NIT Warrant violated the jurisdictional requirements for searches set forth in Federal Rule of Criminal Procedure 41(b) and 28 U.S.C. § 636(a), and therefore, the NIT Warrant was void *ab initio*. As a result, Defendant contends that the good-faith exception to the exclusionary rule does not apply.[7] The Government argues that the magistrate judge was authorized to issue the NIT Warrant because the NIT qualifies as a "tracking device" pursuant to Federal Rule of Criminal Procedure 41(b)(4) and that this Court should broadly interpret Rule 41 to uphold the legality of the search in this instance. Alternatively, the Government argues that even assuming the NIT Warrant violated Rule 41(b), the violation was not of a constitutional nature, rendering suppression inappropriate. The Government further argues that suppressing the evidence would be improper pursuant to the exclusionary rule's good-faith exception. The Court will address the parties' arguments in turn.

---

[7] In initially presenting his main points of argument, Defendant contends that "the FBI intentionally or recklessly omitted information that was material to the Magistrate Judge's determination of probable cause." (Doc. 32 at 4). But Defendant fails to elaborate upon this argument, and therefore, the Court will not address it.

At the outset, the Court notes that, to date, numerous district courts, including two Middle District of Florida courts, have been presented with similar motions to suppress with regard to evidence obtained from the same NIT Warrant. In the vast majority of cases, the courts have denied suppression based on the good-faith exception to the exclusionary rule. This is so despite the fact that the majority of these cases have held that the NIT Warrant did not comply with Rule 41(b). *See generally Kneitel*, No. 8:16-cr-23-T-35JSS, Doc. 158; *United States v. Dzwonczyk*, No. 4:15-CR-3134, 2016 WL 7428390 (D. Neb. Dec. 23, 2016); *Owens*, 2016 WL 7053195; *Tippens*, No. 3:16-cr-05110, Doc. 106; *United States v. Stepus*, No. 15-30028-MGM, 2016 WL 6518427 (D. Mass. Oct. 28, 2016); *United States v. Libbey-Tipton*, No. 1:16-CR-236 (N.D. Ohio Oct. 19, 2016), Doc. 19; *United States v. Scarbrough*, No. 3:16-CR-035, 2016 WL 5900152 (E.D. Tenn. Oct. 11, 2016); *Anzalone*, 2016 WL 5339723; *Allain*, 2016 WL 5660452; *United States v. Broy*, No. 16-cr-10030, 2016 WL 5172853 (C.D. Ill. Sept. 21, 2016); *United States v. Ammons*, No. 3:16-CR-00011, 2016 WL 4926438 (W.D. Ky. Sept. 14, 2016); *United States v. Knowles*, No. 2:15-CR-875-RMG (D.S.C. Sept. 14, 2016), Doc. 62; *United States v. Torres*, No. 5:16-CR-285-DAE, 2016 WL 4821223 (W.D. Tex. Sept. 9, 2016); *United States v. Henderson*, No. 15-CR-00565-WHO-1, 2016 WL 4549108 (N.D. Cal. Sept. 1, 2016); *Adams*, 2016 WL 4212079; *United States v. Rivera*, No. 2:15-cr-266-CJB-KWR (E.D. La. July 20, 2016), Doc. 69; *United States v. Werdene*, 188 F. Supp. 3d 431 (E.D. Pa. 2016); *United States v. Michaud*, No. 3:15-CR-05351-RJB, 2016 WL 337263 (W.D. Wash. Jan. 28, 2016).[8] Four courts have held that the NIT Warrant was void *ab*

---

[8] Significantly fewer cases, while also declining to suppress evidence obtained through the Government's use of the NIT, have held that the NIT Warrant was properly issued pursuant to Rule 41(b). *See generally United States v. Lough*, No. 1:16-CR-18, 2016 WL 6834003 (N.D. W. Va. Nov. 18, 2016); *United States v. Kienast*, No. 16-CR-103, 2016 WL 6683481 (E.D. Wis. Nov. 14, 2016); *United States v. Johnson*, No. 15-00340-01-CR-W-GAF, 2016 WL 6136586 (W.D. Mo. Oct. 20, 2016); *United States v. Smith*, No. 4:15-cr-467 (S.D. Tex. Sept. 28, 2016), Doc. 41; *United States v. Jean*, No. 5:15-CR-50087-001, 2016 WL 4771096 (W.D. Ark. Sept. 13, 2016); *United*

*initio* and that the good-faith exception did not apply, and therefore, suppression was appropriate. *See generally United States v. Croghan*, No. 1:15-cr-48, 2016 WL 4992105 (S.D. Iowa Sept. 19, 2016); *United States v. Workman*, No. 15-CR-397, 2016 WL 5791209 (D. Colo. Sept. 6, 2016); *United States v. Arterbury*, No. 4:15-CR-182-JHP (N.D. Okla. Apr. 25, 2016), Doc. 42, *report and recommendation adopted*, *United States v. Arterbury*, No. 4:15-CR-182-JHP (N.D. Okla. May 12, 2016), Doc. 47; *United States v. Levin*, 186 F. Supp. 3d 26, 44 (D. Mass. 2016).

       *1.*     *Whether the NIT Warrant Was Sufficiently Particular*

Defendant first argues that the NIT Warrant was overbroad and that it failed to satisfy the Fourth Amendment's particularity requirement.[9] The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. It therefore follows that a "warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (quotation omitted). But Defendant's argument can be quickly disposed of as this argument has been raised numerous

---

*States v. Eure*, No. 2:16cr43, 2016 WL 4059663 (E.D. Va. July 28, 2016); *United States v. Matish*, 193 F. Supp. 3d 585 (E.D. Va. 2016); *United States v. Darby*, 190 F. Supp. 3d 520 (E.D. Va. 2016); *United States v. Epich*, No. 15-CR-163-PP, 2016 WL 953269 (E.D. Wisc. Mar. 14, 2016); *see also United States v. Acevedo-Lemus*, No. SACR 15-00137-CJC, 2016 WL 4208436 (C.D. Cal. Aug. 8, 2016) (denying suppression without explicitly ruling on whether the NIT Warrant was properly issued pursuant to Rule 41(b)).

[9] Many of the courts that have addressed this precise issue have first asked whether the Government was required to obtain a warrant in the first place, that is, whether the defendant had a reasonable expectation of privacy in his computer. *See, e.g.*, *Adams*, 2016 WL 4212079, at *4 (concluding that the defendant had a reasonable expectation of privacy in his computer and stating that prior courts that focused on the defendant's expectation of privacy in his IP address had conflated the issue). *But see, e.g.*, *Werdene*, 188 F. Supp. 3d at 443–46 (framing the issue as whether Defendant had a reasonable expectation of privacy in his IP address). As neither party has raised the issue, the Court assumes for purposes of the motion that this was indeed a search that implicated Defendant's Fourth Amendment rights and therefore required a warrant.

times yet "[e]very court to consider this question has found the NIT search warrant sufficiently particular." *Anzalone*, 2016 WL 5339723, at *7 (citing cases that held that the NIT Warrant was sufficiently particular).

## 2. *Whether the NIT Warrant Violated Rule 41(B)*

Defendant's second argument, however, that the magistrate judge did not have the authority to issue the NIT Warrant due to lack of jurisdiction pursuant to Federal Rule of Criminal Procedure 41(b) and 28 U.S.C. § 636(a) presents a more difficult question, as indicated by the various conclusions reached by the other district courts that have analyzed the issue. "The Federal Magistrates Act, 28 U.S.C. § 636(a), provides that each United States magistrate judge serving under this chapter shall have within the district in which sessions are held by the court that appointed the magistrate judge (1) all powers and duties conferred or imposed by law or by the Rules of Criminal Procedure." *Adams*, 2016 WL 4212079, at *5 (quotation omitted). "Federal Rule of Criminal Procedure 41(b) confers upon the magistrate judge the authority to issue search warrants in five distinct circumstances[.]" *Id.*

The parties' arguments focus on whether the NIT Warrant was properly issued pursuant to Federal Rule of Criminal Procedure 41(b)(4), which provides that a magistrate judge may "issue a warrant to install within the district a tracking device" and that "the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both." Notably, "a majority of courts have found that the NIT Warrant does not fit under 41(b)(4)." *Henderson*, 2016 WL 4549108, at *3. "After reviewing the plain text of the Rule, and considering the well-reasoned opinions of several federal district courts, the Court finds that the Eastern District of Virginia magistrate judge exceeded the jurisdictional limitations set forth in Rule 41(b)." *Dzwonczyk*, 2016 WL 7428390, at *7. "In reaching this decision, the Court rejects

the argument—for the reasons set forth in *Croghan, Henderson,* and *Werdene*—that the NIT was a 'tracking device,' and that the warrant was therefore valid under subpart (b)(4)." *Id.* Specifically, the NIT "did not track the movement of a person or object. Indeed, it did not track the movement of anything; rather, it caused computer code to be installed on the activating user's computer, which then caused such computer to relay specific information to the government-controlled computers in Virginia." *Croghan*, 2016 WL 4992105, at *4 (quotation omitted); *see also Adams*, 2016 WL 4212079, at *6 ("[T]he NIT does not track; it searches.").

That the NIT Warrant was not authorized under 41(b)(4) is bolstered by Defendant's argument that a recent amendment to the Rule authorizes the issuance of the type of warrant issued here. Though this alone would not be enough to convince the Court that the magistrate exceeded her authority, it at least supports the conclusion that "there [was] . . . ambiguity as to the state of the law." *Torres*, 2016 WL 4821223, at *6. Given that this case presents such a close call—as many of the other district courts have also acknowledged—such ambiguity helps tip the scale in Defendant's favor. *See Owens*, 2016 WL 7053195, at *6 (stating that the "amendment to Rule 41(b) strongly suggests the NIT Warrant was not authorized in this case").

While the Court acknowledges that a more flexible reading of the rule may be appropriate in certain circumstances, upholding this type of search under the tracking device provision would "stretch[] the rule too far." *Michaud*, 2016 WL 337263, at *6; *see also Dzwonczyk*, 2016 WL 7428390, at *6 ("A contrary holding . . . would cast too broad a net, thereby encompassing investigative techniques not otherwise envisioned by the Rule."); *Torres*, 2016 WL 4821223, at *6 ("It is inappropriate for this Court to engage in a process of finesse justifying an ethereal presence of the defendant's computer in Virginia, where the plain language of the rule as now written does not provide jurisdiction under these circumstances."); *Henderson*, 2016 WL 4549108,

at *4 ("The NIT search does not meet the requirements of 41(b)(4) because, even though it was analogous to a tracking device in some ways, it nevertheless falls outside the meaning of a 'tracking device' as contemplated by the rule."); *Werdene*, 188 F. Supp. 3d at 441 ("Even a flexible application of the Rule . . . is insufficient to allow the Court to read into it powers possessed by the magistrate that are clearly not contemplated and do not fit into [Rule 41(b)]."). Thus, the Court concludes that the NIT Warrant violated Rule 41(b).[10]

### 3. Whether the Violation of Rule 41(b) Was Unconstitutional

Having determined that the NIT Warrant violated Rule 41(b), the Court must now determine whether the evidence obtained in violation of the Rule must be suppressed. "[U]nless a clear constitutional violation occurs, noncompliance with Rule 41 requires suppression of evidence only where": "(1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed"; or "(2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *United States v. Loyd*, 721 F.2d 331, 333 (11th Cir. 1983) (quoting *United States v. Stefanson*, 648 F.2d 1231, 1235 (9th Cir. 1981)). Defendant first argues that the violation of Rule 41(b) amounts to a constitutional violation, and therefore, the evidence must be suppressed. Specifically, Defendant avers that because the magistrate judge was without authority to issue the warrant, it is as if no warrant was issued at all. *See United States v. Krueger*, 809 F.3d 1109, 1126 (10th Cir. 2015) (Gorsuch, J., concurring). Accordingly, Defendant suggests that he was the victim of a warrantless search, in violation of his Fourth Amendment Rights. But the "magistrate judge in the Eastern District of Virginia had the authority to issue search warrants—that is, the inherent power to do so." *Adams*, 2016 WL

---

[10] Because the Court has determined that the NIT Warrant was issued in violation of Rule 41(b), it declines to address Defendant's separate argument that the NIT Warrant was not authorized under 28 U.S.C. § 636(a).

4212079, at *6. For that reason, the Court rejects Defendant's argument that it is as if no warrant was issued. Moreover, a warrant comports with the Fourth Amendment so long as it is (1) supported by probable cause, (2) sufficiently particular, and (3) issued by a neutral and detached magistrate. *Dalia v. United States*, 441 U.S. 238, 255 (1979). Of these requirements, Defendant has only challenged whether the warrant was sufficiently particular, which this Court previously deemed a meritless argument. Accordingly, the NIT Warrant complied with the Fourth Amendment. Additionally, Defendant has not convinced this Court that a violation of Rule 41(b) amounts to a constitutional violation. *See Adams*, 2016 WL 4212079, at *6 ("The Court views a Rule 41(b) violation to be a technical or procedural violation.").

Given that no constitutional violation occurred, suppression is only appropriate upon a finding that Defendant was prejudiced by the violation or evidence that the rule was violated intentionally and deliberately. Defendant does not argue that the NIT Warrant was obtained through any intentional and deliberate disregard of Rule 41(b). Rather, Defendant argues that he was prejudiced because had Rule 41(b) been followed, the NIT Warrant would have never been issued. As a result, the Government would never have discovered Defendant's IP address, and therefore, the Government would not have been able to identify Defendant's computer and obtain the residential search warrant which resulted in the search of Defendant's computer and other electronic devices. Thus, Defendant argues for a literal interpretation of the standard to determine whether prejudice has resulted.[11] The Government on the other hand argues for a more broad approach, suggesting that the relevant inquiry is not whether the search would have occurred had Magistrate Judge Buchanan not violated Rule 41(b) in this particular instance—more or less, a

---

[11] The Court acknowledges that Defendant's interpretation of the standard is not entirely unreasonable. *See, e.g.*, *Ryan*, 2016 WL 4212079, at *8.

type of "but for" test—but whether evidence obtained in violation of Rule 41(b) could have been obtained by other lawful means. The Court is persuaded that the Government's interpretation is more appropriate and that Defendant was not prejudiced.

The standard articulated above, which governs whether suppression is appropriate where a non-constitutional violation occurs, originates from the Ninth Circuit and has been adopted by the Eleventh Circuit and several other circuit courts. Courts that have applied this same standard in addressing whether a defendant was prejudiced by the violation of Rule 41(b) have looked to the origin of this standard and its "early use in the Ninth Circuit" and concluded that "in the sense that the search would not have occurred if the rule had been followed" should be interpreted to mean that "courts should consider whether the evidence obtained from a warrant that violates Rule 41(b) could have been available by other lawful means, and if so, the defendant did not suffer prejudice." *Michaud*, 2016 WL 337263, at *6 (citing *United States v. Vasser*, 648 F.2d 507, 511 (9th Cir. 1980)); *accord Tippens*, No. 16-CR-5110, Doc. 106 at 15; *see also Dzwonczyk*, 2016 WL 7428390, at *14 (reaching the same conclusion and citing *Vasser*); *Henderson*, 2016 WL 4549108, at *5 (same). The Government argues that the NIT Warrant could have properly been presented to a federal magistrate judge in the Middle District of Florida. This Court agrees and also notes that "courts have generally concluded that, even assuming a violation of 41(b), an Article III judge in the Eastern District of Virginia could have authorized this particular search warrant." *Dzwonczyk*, 2016 WL 7428390, at *13 (quotation omitted) (citing cases that have reached this conclusion). Accordingly, there were other lawful means by which the Government could have obtained the NIT Warrant. It therefore follows that the violation of Rule 41(b) did not prejudice Defendant, and suppression is not warranted.

    4.  *Whether the Good-Faith Exception Applies*

Even if the Court's previous conclusions were erroneous—that is, even if the violation of Rule 41(b) qualified as a constitutional violation or Defendant was prejudiced by the technical violation of Rule 41(b)—this Court agrees with the overwhelming majority of courts that the good-faith exception applies, making suppression an inappropriate remedy.

"The exclusionary rule is a judicially created remedy designed to safeguard Fourth Amendment rights through its deterrent effect, and requires that evidence obtained through an illegal search may not be used by the government in a subsequent criminal prosecution." *United States v. Henry*, No. 16-13009, 2017 WL 1031147, at *1 (11th Cir. Mar. 17, 2017). The exclusionary rule, however, is "limited to those unusual cases in which it may achieve its objective: to appreciably deter governmental violations of the Fourth Amendment." *Johnson*, 2016 WL 6136586, at *10 (citing *United States v. Leon*, 468 U.S. 897, 909 (1984)). In *Leon*, "[t]he Supreme Court created a good-faith exception to this rule, stating that courts generally should not hold inadmissible evidence obtained by officers acting in reasonable reliance upon a search warrant later found to be unsupported by probable cause or technically insufficient." *Henry*, 2017 WL 1031147, at *1. The exception is largely grounded in the idea that "when law enforcement officers exercise good faith, [the] goal of suppression is not met, and [thus] exclusion is not required." *United States v. Lara*, 588 F. App'x 935, 938 (11th Cir. 2014). Therefore, where a warrant is obtained prior to the search, determining whether the good-faith exception applies will "rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Henry*, 2017 WL 1031147, at *1. Furthermore, the exclusionary rule is "a remedy of 'last resort,' justified *only* where the 'deterrence benefits of suppression' outweigh the 'substantial social costs' of 'ignor[ing] reliable, trustworthy evidence bearing on guilt or innocence.'" *United States v. Smith*,

741 F.3d 1211, 1219 (11th Cir. 2013) (quoting *Davis v. United States*, 564 U.S. 229, 237 (2011)). Therefore, the good-faith exception to the exclusionary rule "applies in all but four limited sets of circumstances:" (1) "where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role"; (3) "where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) "where, depending upon the circumstances of the particular case, a warrant is so facially deficient—in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *United States v. Hinton*, No. 16-11594, 2017 WL 191930, at *3 (11th Cir. Jan. 18, 2017).

Defendant attempts to persuade the Court that the good-faith exception does not apply because, due to the violation of Rule 41(b), the warrant was issued without judicial authority and thus is void *ab initio*. Defendant contends that *Leon's* good-faith exception does not apply to void warrants. But, as noted, the magistrate judge had the inherent authority to issue the NIT Warrant. Thus, the Court does not agree with Defendant that the NIT Warrant was void *ab initio* due to the magistrate's purported lack of judicial authority. *See Adams*, 2016 WL 4212079, at *6 (declining to follow the cases concluding that the violation of Rule 41(b) renders a warrant void *ab initio*); *see also United States v. Stepus*, 2016 WL 6518427, at *2 ("The magistrate judge may have lacked authority to issue a warrant that permitted deployment of the NIT outside of the court's district, but the warrant was not void *ab initio*. The magistrate judge had authority to allow the NIT to be deployed to computers within the court's district and she signed the warrant within that district."

(citations omitted)); *Dzwonczyk*, 2016 WL 7428390, at *12 (adopting the reasoning articulated in *Stepus*); *Anzalone*, 2016 WL 5339723, at *11 (reaching the same conclusion as the *Stepus* court).

Moreover, even if the NIT Warrant was void *ab inito*, the Court would still disagree with Defendant's position. Defendant relies, in part, on *United States v. Levin* to support the proposition that the good-faith exception is not available when a warrant is issued without jurisdictional authority. However, "*Levin* has been subsequently called into question, primarily because it relies on a Sixth Circuit opinion, *United States v. Scott*, 260 F.3d 512, 515 (6th Cir. 2001), that was effectively overruled in *United States v. Master*, 614 F.3d 236 (6th Cir. 2010)." *Kneitel*, No. 8:16-cr-23-T-35JSS, Doc. 158 at 2; *see also Anzalone*, 2016 WL 5339723, at *11 (noting that the *Master* court stated that "the court's earlier holding that the good faith exception did not apply to warrants that were void *ab initio* was no longer viable in light of more recent Supreme Court cases such as *Herring*" (quotation omitted)). Additionally, despite Defendant's argument that the *Leon* Court never suggested that the good-faith exception applies where the judicial officer lacked authority to issue the warrant, several courts have held that the good-faith exception is not foreclosed where a warrant that is void *ab initio* is issued. *See Anzalone*, 2016 WL 5339723, at *11 (collecting cases). Furthermore, "there is no authority from the Eleventh Circuit suggesting that the good faith exception is wholly foreclosed under these circumstances." *Kneitel*, No. 8:16-cr-23-T-35JSS, Doc. 158 at 2.

Consequently, this Court joins the majority of courts that have ruled on this precise issue, concluding that the good-faith exception applies. The Court finds the reasoning of another Middle District of Florida case, *United States v. Kneitel*, particularly persuasive. In declining to suppress the evidence, the *Kneitel* court stated:

> [T]he Court does not find that the conduct of the agents in requesting the NIT warrant under Rule 41 was sufficiently deliberate such that exclusion can

> meaningfully deter it. . . . [T]here is no indication that the agents acted in flagrant disregard of Rule 41 in seeking approval of the warrant or otherwise acted unresasonably in relying on the magistrate judge's independent determination that the court had authority to issue the warrant. Under these circumstances, the substantial cost to society of potentially allowing thousands of culpable defendants to go free cannot be outweighed by the marginal deterrence, if any, that would result from suppression. Indeed, the Court finds that . . . the cost . . . would far outweigh the benefit of preserving the precise adherence to a complicated and imprecise Rule application, especially where the Rule has now been modified and the occurrence is not likely to be repeated.

*Id.* at 6. In sum, the Court concludes that the good-faith exception to the exclusionary rule applies, and therefore, the evidence will not be suppressed.

### IV. CONCLUSION

For the foregoing reasons, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant's Motion to Dismiss (Doc. 31) is **DENIED**.

2. Defendant's Motion to Suppress (Doc. 32) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on April 12, 2017.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record